**United States District Court**
**Eastern District of Massachusetts**

| | | |
|---|---|---|
| **Robert David Beckley** | ) | |
| ***Plaintiff** | ) | **Civil Acton** |
| | ) | **No.**_____ |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | **Civil** |
| | ) | **Complaint** |
| **Browning Ferris Industries** | ) | |
| **("BFI") of North America** | ) | |
| **Thomas H. Van Weelen CEO BFI of North America** | ) | ***Jury trial demanded on** |
| **In his professional and individual capacities** | ) | **all counts** |
| **Peter Hutchings, truck driver BFI,** | ) | |
| **North America, in his professional and individual capacities,** | ) | |
| **Gino Dugan, BFI General Manger in his professional and individual)** | | |
| **John Does** | ) | |
| ***Defendants** | ) | |

<u>Introduction</u>

Robert David Beckley ["Plaintiff"] of North Carolina hereby asserts the following claims against the

defendants in the above titled action:

    (1)  Violation of 42 U.S.C. 1983: Refusing or neglecting to prevent.

    (2)  Violation of Mass. Civil Rights Act (M.G.L.c.12, sec. 11H)

    (3)  Assault

    (4)  Intentional infliction of emotional distress.

    (5)  Negligent infliction of emotional distress.

    (6)  Violation of 42 U.S.C. 1983: Freedom of deprivation of life and liberty.

    (7)  Negligence

    (8)  Battery

## Jurisdiction

1. Jurisdiction of this court arises under 28 U.S.C. sections 1332, 1337, 1343 (a), and 1367 (a), 42 U.S.C. sections 1983, 1985, 1986, and 18 U.S.C. 1961-1968.

2. Jurisdiction of this court for the pendent claims is authorized by F.R. civ. P. 18 (a), and arises under the doctrine of jurisdiction as set forth in <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715 (1966).

## Parties

3. Plaintiff Robert David Beckley is a natural person, and prisoner confined at FCI Fairton, Fairton NJ, U.S.A. 02114. Plaintiff was a citizen of 1414 Village Crossing, Chapel Hill North Carolina at all times relevant to this complaint. His mother's address and address of all correspondence should be sent to 277 Concord Road Bedford, MA 01730 in Middlesex County, U.S.A. Upon release plaintiff will be returning to North Carolina.

4. Defendant BFI Division of North America is a [BFI] subsidiary of Allied Waste Industries and contractor of the City of Boston. Legal corporation with a local location at: BFI Division of North America, 320 Charger Street Revere, MA 82151. BFI has a contract with the City of Boston, Massachusetts and it's employees are subject to the color of statute, laws, customs, and regulations the City of Boston, Commonwealth, BFI, and the U.S.A.. It is responsible for the policies, procedures, and practices implemented through its various plants, offices, agencies, departments, employees, and for injury occasioned thereby. It was also the employer of defendant Peter Hutchings, truck driver, defendant Gino Dugan, supervisor, and defendant Thomas H. Van Weelden CEO at all times relevant to this complaint. It's corporate headquarter is located at B.F.I./Allied Waste Industries, 15880 N. Greenway-Hayden Loop, suite 100 Scottsdale, AZ 85260.

5. Defendant Peter Hutchings ["Peter"] who is a natural person was, an on duty truck driver employed by BFI Division of North America, resident of Massachusetts residing at 8 Brentwood Avenue Avon, MA at all times relevant to this complaint. His duties included transportation of garbage.

6. Defendant Gino Dugan, General Manger ["Gino"] a natural person was and has been a supervisor of defendant Peter and employee of BFI. He has an office located at: BFI Division of North America, 320 Charger Street Revere, MA 02151 at all times relevant to this complaint.

7. Defendant Thomas Hl. Van Weelen, CEO of BFI, and Allied Waste Industries. He was and has been responsible for the promulgation and implementation of: procedures, training of employees including defendants Gino and Peter, practices, customs, and oversight of all the corporations activities at all times relevant to this complaint. He has an office located at: Thomas Van Weelen, CEO, BFI/Allied Waste Industries, 15880 N. Greenway-Hayden Loop, suite 100 Scottsdale, AZ 85260.

8. Defendant John Doe is/are all supervisors, managers, and those responsible for training defendant Peter Hutchings that are presently unknown to the plaintiff.

9. Plaintiff sues all BFI of North America employees in their professional and individual capacities.

10. At all times material to this complaint defendants BFI of North America, CEO, defendant Peter, and John Doe acted toward plaintiff under color of customs, rules, statutes, and regulations of the State of Massachusetts, United States of America, and BFI of North America.

Facts

11. Plaintiff was involved in a minor car accident on May 10th, 2002 at approximately, 8:30 pm on <u>Dartmouth Street near the corner of Stuart Street</u> in Boson MA U.S.A. County of Suffolk.

12. Defendant Peter, who was an on duty truck driver for BFI of North America driving his company truck marked "BFI" stopped at the scene of the accident.

13. Defendant "Peter" Hutchings was a witness to this accident.

14. Defendant Peter then exited his truck and approached the plaintiff, grabbed him aggressively on the arm and stated "If you don't get the fuck out of here now, I'll get the gun in my truck, and I'm not afraid to u se it"! Many people were witness to his threat.

15. Defendant Peter is not a licensed law enforcement officer, and the plaintiff felt threatened, intimidated and coerced into leaving the accident scene for fear of his life.

16. The plaintiff who was in fear for his life got in his Buick Rendezvous automobile, and attempted to get away from defendant Peter who had just threatened his life, and in doing so, forced the plaintiff into leaving the scene of an accident a criminal offense.

17. Defendant Peter then for some unknown reason returned to his truck and followed the plaintiff through numerous streets from the scene of the accident. Right onto Stuart from Dartmouth, left onto Trinity Place, left on to St. James, and then a right onto Blagden St. The plaintiff thought he lost defendant Peter and parked in a spot on Blagdon, and intended to find an officer to report what defendant Peter had said and done to him and return to the accident scene. Upon, exiting the vehicle, defendant reappeared in his vehicle and stated, "There you are u puny fuck". The plaintiff the rushed back in his car and drove away to escape defendant Peter who seemed intent on harming the plaintiff.

18. The plaintiff in fear for his life due to the threat of lethal force defendant Peter had just made to him verbally panicked and subsequently did not stop and not stop at numerous re lights, and took turns on one way streets going the wrong way in attempts to lose defendant Peter, due to the threat defendant Peter made, and the fact that he was following him for an unknown reason.

19. The plaintiff received multiple traffic citations, mental anguish, physical injuries, and criminal charges due to his attempts to escape defendant Peter.

20. The plaintiff was unarmed, and had no way to defend himself against defendant Peter. Had defendant Peter not threatened the plaintiff, the plaintiff would not have left.

21. The plaintiff had to spend 7 days in jail, and pay fines. Suffer a loss of license, increased insurance rate due to the traffic citations and criminal charges he received for his actions due to trying to escape from defendant Peter.

22. After plaintiff realized that he had finally lost defendant Peter, he stopped his motor vehicle on Boylston Street in Boston near the corner of Dartmouth.

23. After stopping the motor vehicle, the Boston police officer Joseph King shot him in the head. (See exhibit 1 witness statement.)

24. The plaintiff received numerous injuries and impairments of a neurological, psychological, and physical nature including but not limited to: visual impairment, partial hearing loss in right ear, post traumatic stress disorder, constant headaches, constant hand tremor likely due to brain damage, and other various injuries as a result of defendant Peter's conduct.

25. There is a high probability of likelihood that the plaintiff will continue to suffer from said injuries and/or impairments.

26. Plaintiff has a large scar on the back of his head due to the gunshot. This may prevent plaintiff from obtaining future work in the film industry, which he has worked in previously.

**Count 1: Violation of 42 U.S.C. 1983: refusing or neglecting to prevent**

27. Plaintiff repeats, re-alleges, and incorporates by reference the allegations in <u>exhibit 1</u>, and <u>paragraphs 1 through 26</u> above with the same force and effect as if herein set forth.

28. At all times relevant to this complaint, defendant Peter was acting under the direction and control of BFI, CEO, and John Does, and all defendants were subject to 42 U.S.C. 1983, 1985, 1986, 1988 at all times relevant to this complaint.

29. Acting under color of law, and pursuant to official law, policy, or custom, recklessly, or with gross negligence failed to instruct, supervise, control, and discipline on a continuing basis defendant employees including truck drivers such as defendant Peter to refrain from:

    (a) Unlawfully and maliciously harassing a citizen who was acting in accordance with his U.S. Constitutional and Statutory rights, privileges, and immunities.

    (b) Unlawfully and maliciously assaulting, threatening to kill, and stalking a citizen who was action in accordance with his constitutional and statutory rights, privileges, immunities, and otherwise depriving plaintiff of his Constitutional and Statutory rights.

30. Defendants BFI, CEO, and John Doe had knowledge or, had they diligently exercised their duties to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge that the wrongs to be done, as heretofore alleged, were about to be committed. Defendants BFI, CEO, and John Does had the power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with gross negligence failed or refused to do so.

31. Defendants BFI, CEO, and John Does directly or indirectly under color of law approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of defendant employees heretofore described.

32. Plaintiff additionally had to post $5,000 cash bail to be released from jail from charges that were a direct result from the plaintiff's attempts to escape defendant Peter.

33. Plaintiff was dubbed "wrong way driver" by various newspapers and television stations due to his attempts to escape from defendant Peter. This was very embarrassing to plaintiff. Plaintiff also missed a week of work as CEO of a corporation due to the detention on the criminal charges, and had difficulty in performing his duties upon returning to work as a direct result of the conduct of defendant Peter resulting in astronomical loss of personal income and company revenue, and there is a high probability of likelihood that the plaintiff will have to receive disability benefits resulting in a substantial loss of income, that were a direct result of his attempts to escape defendant Peter.

34. As a direct and proximate cause of the negligent and intentional acts of Gino, BFI, CEO, and John Does as set forth in paragraphs 29 through 33 above, plaintiff suffered physical harm, loss of income, loss of drivers license, embarrassment, 7 days loss of freedom/imprisonment, criminal convictions, fines, and severe mental anguish in connection with the deprivation of his constitutional and statutory rights.

   **Wherefore,** plaintiff demands judgment against all the defendants, jointly and severally, for actual, general, special, compensatory damages in the amount of $3,700,000, and

further demands judgment against all defendants, jointly and severally for [1] punitive

damages in an amount to be determined at the time of trial to be fair, just, and appropriate

plus the costs of this action, including attorney fees, and such other relief deemed to be

just and equitable.

**Count 2: Violation of Mass Civil Rights Act, M.G.L. c.12, sec 11H**

35.  Plaintiff repeats, re-alleges, and incorporates by reference the allegations in exhibit 1 and
     paragraphs 1 through 34 above with the same force and effect as if herein set forth.

36.  At all times relevant herein, the conducts of all defendants were subject to Massachusetts
     Civil Rights Act.

37.  Defendant Peter interfered with or attempted to interfere by threats, intimidation, [2] or
     coercion with the plaintiff's exercise and enjoyment of his rights – e.g. his rights to
     liberty, his right to stay or stand wherever the plaintiff wants in this case a public area to
     wit, threatening to kill the plaintiff if he doesn't leave    secured by the state and federal
     constitutions of laws of the United States and/or the Commonwealth of Massachusetts. [3]
     There must also be evidence of "actual or potential physical confrontations involving a
     threat of harm". Id. At 473 n.8, though the confrontation may involve third persons and
     the threat of harm need not be directed at the plaintiff. See Redgrave v. Boston
     Symphony Orchestra, 399 Mass. at 100-101 (potential physical harm to audience and
     orchestra members by third persons protesting plaintiff's political views is a
     confrontation within the MCRA). A plaintiff is not required to prove a specific intent to
     threaten, intimidate, or coerce for the purpose of interfering with a secured right. Id.at 99-
     100.

---

[1]  "Punitive damages are recoverable in sec. 1983 where defendant's conduct is motivated by an evil motive or intent, or where it
involves reckless or callous indifference to plaintiffs federally protected rights. Smith v. Wade, 461 U.S. 30, 50-51 (1983);  Clark v.
Taylor 710 f. 2d 4, 14 (1st cir. 1983). Miga. Supra at 355
[2]  "Under the MCRA, a 'threat'…. involves the intentional exertion of pressure to make another fearful or apprehensive of injury of
harm, 'intimidation' involves putting in fear for the purpose of compelling or deterring conduct, coercion is 'the application to another
of such force, either physical or moral. As to constrain him to do against his will something he would not otherwise have done."
"Sarvis V. Boston Safe Deposit & Trust Co. 47 Mass. APP. CT. 86 (1999) Quoting Planned Parenthood League of Mass., Inc. v.
Blake 417 Mass. 467 cert denied 513 U.S. 868 (1994).
[3]  Rogan v. Menino 973 F. supp 72, 77 (D. Mass 1997)

38. Thus, under color of state, plaintiff's liberty was threatened, and he was intimidated and coerced into not enforcing his rights to stand ion a public area where he was involved in a motor vehicle accident.

39. Defendants Gino, BFI, CEO, and John Does are liable under the doctrine of respondeat superior.

40. As a result of the print and electronic media's extensive coverage and naming plaintiff "wrong way driver" plaintiff lost friends, business opportunities, and hurt family ties all because he was trying to escape defendant Peter.

41. As a direct and proximate result of the conduct of the defendants, plaintiff was intimidated and put in continuing anxiety and has suffered damages including, but not limited to the aforesaid damages.

**Wherefore,** plaintiff demands judgment against all defendants, jointly and severally for injunctive relief, actual, special, compensatory damages in the amount of $10,000,000, and further demands judgment against all defendants jointly and severally for punitive damages in an amount to be determined at the time of trial to be fair, just, and appropriate plus attorney's fees, and the costs of this proceeding plus any other relief deemed just and equitable.

### Count 3: Assault

42. Plaintiff repeats, re-alleges, and incorporates by reference the allegations in exhibit 1 and paragraphs 1 through 41 above with the same force and effect as if here in set forth.

43. Plaintiff is a reasonable person.

44. Defendant Peter intentionally created an apprehension of immediate harm by means of a verbal threat stating "If you don't get the fuck out of here now I'll get the gun in my truck and I'm not afraid to use it!" to make the plaintiff leave the scene of a car accident and scare him for no known purpose other then to create in the plaintiff an apprehension of immediate physical harm. [4]

---

[4] Nolan v. Sartorio 37 M.P.S. Torts, sec 121 p.6 (2d ed. 1989 and 1993) supp.) restatement (second) Torts, sec 21

45. Defendants Gino, BFI, CEO, and John Does are liable under the doctrine of respondeat superior.

   **Wherefore,** plaintiff demands judgment against all defendants for injunctive relief, and actual, special, and compensatory damages in an amount deemed at time of trial to be just, fair and appropriate.

## Count 4: Intentional infliction of emotional distress

46. Plaintiff repeats, re-alleges, and incorporates by reference to allegations in exhibit 1, and in paragraph 1 through 45 above with the same force and effect as if here in set forth.

47. Defendants intentionally, and deliberately inflicted emotional distress on plaintiff by maliciously assaulting, and/or violation his U.S. Constitutional rights, or by interfering with the plaintiff's state civil rights by threats, coercion, or intimidation, or knew or should have known that emotional distress was the likely result of their conduct.

48. Defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.

49. The actions of the defendants were the cause of plaintiff's distress.

50. The plaintiff is a reasonable man.

51. The emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure.[5]

52. As a result of the defendants extreme and outrageous conduct, plaintiff was and is, and with a high degree of likelihood will continue to be emotionally distressed due to the intentional exclusion.[6]

53. Defendant Gino. BFI. CEO, John Does are liable under the doctrine of respondeat superior.

54. As a result of the defendant's extreme and outrageous conduct, plaintiff has suffered and will continue to suffer and will continue to suffer mental pain and anguish, severe

---

[5] Agis v. Howard Johnson Co., 371 Mass. 140, 145 (1976)
[6] "Extreme and outrages conduct is not required if the emotional distress resulted from the commission of another Tort. American Velodur Metal, Inc. v. Schinabeu.20 Mass. App. CT. 460, 470-471 (1985)

emotional trauma, embarrassment, lost friends, strained family ties, severe mental anguish, and brutal humiliation.

**Wherefore**, plaintiff demands judgment against all defendants for injunctive relief, and actual, special, and compensatory damages in an amount deemed at time of trial to be just, fair and appropriate.

## Count: 5 Negligent infliction of emotional distress

55. The plaintiff repeats, re-alleges, and incorporates by reference the allegations in exhibit 1 and paragraphs 1 through 54 above with the same force and effect as if herein set forth.

56. Defendant Peter continually negligently inflicted emotional distress on the plaintiff.

57. Defendant had a continuing duty to perform their professional services in such a manner as not to inflict emotional distress on the plaintiff.

58. Defendant Peter breached their duties to the plaintiff.

59. The plaintiff never interfered with the defendant's obligations under the above-described duties.

60. Plaintiff was, is, and with high degree of likelihood will continue to be inflicted with emotional distress due to the negligence of defendants.

61. Defendants Gino, BFI, CEO, and John Does are liable under the doctrine of respondeat superior.

62. As a result of the defendant's negligent conduct, plaintiff has suffered and will continue to suffer physical symptoms, pain, anguish, severe emotional trauma, embarrassment, and humiliation.

**Wherefore**, plaintiff demands judgment, including interest, jointly and severally, against all of the defendants in an amount deemed by this court to be just and fair and in any other such way the court deems just.

## Count 6: Violation of 42 U.S.C. 1983: Freedom of deprivation of freedom, life & liberty, right to assemble, and speech

63. The plaintiff repeats, re-alleges, and incorporates by reference the allegations in exhibit 1 and paragraphs 1 through 62 above with the same force and effect as if herein set forth.

64. As a result of defendant Peter's concerted unlawful and malicious threat/assault of the plaintiff, the scene of an accident for fear of his life, and then once the plaintiff drove off, the defendant peter got in to his company owned truck marked "BFI" and chased after the plaintiff for no known reason causing the plaintiff to drive the wrong way down a one way street thus depriving the plaintiff of his rights to free speech, assemble, liberty, life, and freedom in violation of the plaintiffs first, fourth, fifth, ninth, and fourteenth U.S. Constitutional Rights and in violation of 42 U.S.C. 1983.

65. Defendant's Gino, BFI, CEO, and John Does are liable under the doctrine of respondeat superior.

   **Wherefore**, the plaintiff demands judgment against all the defendants, jointly and severally, for actual, general, special, compensatory damages in the amount of $3,300,000, and further demands judgment against all the defendants, jointly and severally for punitive damages in an amount to be determined at the of trial to be fair, just, and appropriate plus attorney's fees and any other relief the court deems just and equitable.

## Count 7: Negligence

66. The plaintiff repeats, re-alleges, and incorporates by reference the allegations in exhibit 1 and paragraphs 1 through 65 above with the same force and effect as if herein set forth.

67. Defendants BFI, CEO, Gino, and John Does owed a duty to supervise and train their employees including defendant Peter and to take steps to prevent events such as occurred here, to wit, the vicious assault on the plaintiff and subsequent shooting of the plaintiff by Boston police, and when defendant Peter followed the plaintiff after threatening, intimidating, and coercing the plaintiff to leave the scene of the accident for no known reason.

68. Defendant Peter owed a duty to act according to the standard of ordinary care of a truck driver, to wit, not assaulting, threatening, or coercing the plaintiff the failure of which is the proximate cause of plaintiff's injury.

69. As a result of these breaches, which were the proximate cause of the plaintiff's injury, plaintiff suffered harm and damages.

70. BFI. CEO, Gino, and John Does are liable under the doctrine of respondeat superior.

**Wherefore**, plaintiff demands judgment against all defendants for injunctive relief, and actual, special compensatory, and punitive damages, attorney's fees, costs, expenses, and interest in an amount deemed at time of trial to be fair, just, and appropriate.

## Count 8: Battery

71. The plaintiff repeats, re-alleges, and incorporates by reference the allegations in exhibit 1 and paragraphs 1 through 70 above with the same force and effect as if herein set forth.

72. Without the consent of the plaintiff, defendant Peter intentionally, harmfully, and offensively touched the plaintiff to wit, by aggressively grabbing him by the arms.

73. Without consent of the plaintiff, defendant Peter caused a Boston police officer to shoot him in the head with a 40-caliber handgun.

74. Defendants BFI, CEO, Gino, and John Does are liable under the doctrine of respondeat superior.

**Wherefore**, plaintiff demands judgment against all defendants for injunctive relief, and actual, special compensatory, and punitive damages, attorney's fees, costs, expenses, and interest in an amount deemed at time of trial to be fair, just, and appropriate.

This the 21st day of April 2004

Respectfully submitted,

Robert David Beckley, Pro se

Mailing address

Send all correspondence to:

277 Concord Road

Bedford, MA 01730

Exhibit H

RE: COMM. OF MASS                    MAY 11, 2002, 3:10 A.M.
RE: JOSEPH KING                      BPD DISTRICT 4
SPECIAL : 5/10/02

(PLEASE NOTE: .....dots indicate transcriber could not get what was said.)

Conducting this interview is Sgt. Det. James Wyse of the Boston Police Homicide
Unit. Also present is Det. Thomas Connolly of the Boston Police Department
District 4.

## STATEMENT OF DAVID ANDERSON

Q.  Today is Saturday, May 11, the year 2002.  The time now is approximately

3:10 a.m. And we are presently conducting an interview with Mr. David

Anderson at District 4. Conducting this interview is myself, Sgt. Det. James J.

Wyse of the Boston Police Homicide Unit and Det. Thomas Connolly assigned

to District 4.  This interview is relative to a police involved shooting that

occurred on May 10, the year 2002.  At approximately 9:45 p.m. in the vicinity

of Boylston Street and Dartmouth Street.  Sir for the record could you kindly

state your name and spell your last name.

A.  My name is David Anderson.  A-N-D-E-R-S-O-N.

Q.  And what is your address sir?

A.  My address is 12 Townsend Place, Syosset, New York.

Q  And how do you spell Syosset?

A.  S-Y-O-S-S-E-T

Q  And that's in New York.  Sir earlier this evening did we speak with you relative

to this incident.  Ah police involved shooting?

A.  Yes.

Q.    All right. And again we're gonna go over that one more time. Earlier this

      evening on Friday night, were you, did you happen to be in the vicinity of

      Boylston Street and Dartmouth Street?

A.    Yes.

Q.    And while you were there did anything attract your attention to look around the

      area?

A.    Yes. I had noticed that there was police activity and I was curious to see what

      was going on.

Q.    Okay and who were you in the area with?

A.    I was with my girlfriend Margaret Lamb.

Q.    Margaret Lamb?

A.    Yes.

Q.    L-A-M-B?

A.    L-A-M-B.

Q.    And is Margaret also from New York?

A.    Yes.

Q.    Now what part of New York she from?

A.    She's also from Syosset.

Q.    Sir while you and Miss Lamb were in this area what if anything unusual

      occurred?

A.    As we watched the intersection a police officer walked around the intersection

      and then a ahm a maroon SUV approached the wrong way down the street. I

      don't remember

3

Q.    Okay you're not familiar with the area.

A.    I'm not familiar with the area so I don't know the names of the streets.

Q.    And it's fair to say you're only here on a visit?

A.    I'm here on a visit yes.

Q.    Initially before this SUV approached, did you observe this police officer walking from across the street?

A.    Yes I did.

Q.    From where the park area was?

A    Yes.

Q    Okay. And did he come to the sidewalk where you were at?

A    He did not come to the sidewalk he was still in the road.

Q    On the road.

A    Yes.

Q    Okay. And while he was on the road you said a maroon SUV approached him in the opposite, coming from the opposite direction?

A    Yes.

Q    All right. Is it fair to say that Boylston Street is a one way street?

A    Yes it is.

Q    Okay and you know it to be a one way street now?

A    Yes.

Q    And that vehicle was not coming the right way, it was going the wrong way, am I correct?

A    Correct.

4

Q    And the officer saw this? The vehicle was it traveling at a rate of speed, a

normal rate of speed or?

A    Ahm it seemed to be at a normal rate to me.

Q    Okay what would you say about 30 miles an hour or? That is the speed limit.

A    I, I believe so. I, I'm not sure exactly.

Q    Okay. Ah now tell us what happened when the vehicle approached the officer,

where was he situated?

A    He was situated on the side of the road closest to me. And ahm he seemed to

I'm sorry ............

Q    Did anything separate you and that officer?

A    Yes.

Q    What separated you and that officer?

A    I believe there was a white car.

Q    A white car?

A    Yes.

Q    And it was parked there?

A    Yes.

Q    Okay. Now as that vehicle approached was the officer between the white car

and the maroon, and the maroon vehicle?

A    Yes he was.

Q    Okay. And then he stepped back at that time?

A    I, I believe that he took a short, a small step back.

Q    In order to avoid being hit?

A    I, I would imagine so.

Q    All right.  And at that time he began, the officer began to chase the vehicle?

A    He began to chase the vehicle on foot.  He stayed ahm pretty much even with

the passenger side, the front passenger side of the window.

Q    Did he ever grab hold of the vehicle?

A    I did not see him touch the vehicle, no.

Q    What happened then, what transpired next?

A    As the vehicle approached the ahm intersection it began to make a turn.  A

right-turn.

Q    A right-hand turn?

A    Yes.  And it slowed down as it approached the intersection.

Q    Okay.

A    And ahm I saw the officer standing in a stance with a ahm with the weapon

aimed in towards the car.  Towards the driver?

Q    Okay.  And the vehicle was still moving at that time?

A    When he was standing like that the vehicle, I do not believe the vehicle was

moving.

Q    When did he fire the weapon?

A    He, I, I believe that the vehicle had come to a stop before he fired the weapon.

Q    And did you see, how far away from the vehicle he was when he fired the

weapon?

A    I believe he was around three or four feet away from the vehicle.

Q    And the vehicle, are you sure the vehicle was stopped at that time?

A    I am not positive. It was either completely stopped or going very slow.

Q    And how many, did you see the officer fire the shots?

A    I did not see him fire the shots.

Q    Okay. Could you see the officer fire the shots?

A    From where I was standing?

Q    Yes.

A    Yes.

Q    Well why didn't you see them? Did you turn?

A    What, well I might have. I might have turned away. As I, we heard gunshots
     so.

Q    Okay. But you didn't physically see, you didn't see the officer fire the shots?

A    I, I did not see smoke coming from his weapon. So I don't know if they were
     fired as I watched or not.

Q    Okay. All right. How many shots did you hear?

A    Ahm I believe I heard three or four shots. I think it was three though.

Q    Did the vehicle stop at that time?

A    The vehicle was stopped yes.

Q    And what did the officer do then?

A    The officer remained standing in that same position. The stance with his
     weapon pointed at the driver.

Q    Did he get close (sounds like) to the vehicle at that time, or?

A    I believe he did. At that point after the shots we ah, everyone had started
     running. And I, and I also began running and I was watching back over my

shoulder. We ahm, we ran to where CVS was and watched from there. It seemed as though there was not going to be anymore gunfire. We went back to the corner.

Q   Let me ask you, how many people were in the area at the time this occurred?

A   Ahm I would say that eight people probably ran with me in the direction that I was headed on my intersection. I do not know how many people were on the other corners.

Q   Okay from where you were, were people lingering around or were they, were there any people congregating in that corner by the bank. Or ............

A   Just standing there hanging out?

Q   Ya.

A   I don't believe so, it appeared like they were all ..........

Q   So were there other people who witnessed what you witnessed?

A   Yes.

Q   Do you know any of those people?

A   I do not. Well I know my girlfriend.

Q   Margaret

A   Margaret, Margaret Lamb.

Q   Margaret Lamb.

Q   Ah Detective Connolly do you have any questions?

DET. CONNOLLY:

Q   Ya Dave I just ask this, ask you a couple of questions. Were there a lot of people in the area? I know that there was time going on up at the tent up there

across the way. Was there a lot of foot traffic?

A    Ahm I'm not, I'm not from around here so I don't know in relation to any other
     day.

Q    Ya

A    But it, it seemed compared to the afternoon when I had gotten there, there were
     not as many people.

Q    Okay but where, there were people?

A    There were people.   Yes.

Q    There were people

A    Yes

Q    On both sides of the street?

A    There were people on every side of the street, yes.

Q    All through the intersection on both, all sides? Just a regular

A    It was a regular thing.

Q    Busy?

A    Yes.

Q    Not as busy as the afternoon but

A    Right.

Q    There were a lot of foot traffic?

A    There were people crossing the street, yes.

Q    Okay. Ahm There's people behind you, in front of you?

A    Correct.

Q    Okay. Ahm Now I know when I talked to you earlier in my interview, you had

said that ah in fact I'm reading it hear the off, ...... the officer walked along the

passenger side of the vehicle. Would you like to clarify that for me?

A    I'd like to clarify yes.

Q    Okay good. Thank you.

A    It wasn't, it was not a walk it was more like a run. But it only occurred for

about three or four steps. So I wouldn't consider it running.

Q    Okay. Ahm ..... and you also if the officer was saying anything to the vehicle

or would you have been able to hear it?

A    I would think because of my proximity, I would've been able to hear it. But I

would say that because of the noise of the traffic and also the direction that he

was facing that there was a possibility that I might not have.

Q    Okay so he could have said something and you didn't, you didn't hear it?

A    He could have said something but I did not hear it, no.

Q    Okay. Ahm And the officer was standing he wasn't on the sidewalk but was

standing on the side closest to you?

A    Correct.

Q    Between the car, the white car. You, the white car, him and the SUV. Is that

fair to say?

A    Yes.

Q    Okay. Ah Okay ah and you were just with you and your girlfriend out for the

night?

A    Yes.

Q    So you didn't know any other people. You aren't from this area,

A    Correct.

Q    So there were other people around but you wouldn't have known them?

A    Exactly.

Q    Okay. So you had a hell of a nights visit?

A    Yes I did.

Q    Ah I can't think of anything else Sgt. Do you ah

SGT. WYSE:

Q    At the time you observed the officer on the street and the vehicle approaching did you make further observation of civilians crossing the street?

A    I do not think that people were crossing the street at that time.

Q    Did you see anybody crossing the street?

A    I did not remember seeing anyone.

Q    Okay. I have no further questions.

Q    Okay the time now.

DET. CONNOLLY:

Q    I ah would like to ask one more question. I know that you're saying you didn't see any, anybody, but we talked about there was people in the area. Is it possible there was people far, farther down the street? I mean, I'm not trying to box you in Dave,

A    People what crossing the street?

Q    Ya it was foot traffic,

A    It could have been possible.

Q    Ya. Okay.

A    Yes.

Q    All right. That's all I just wanted to give a fair represent, you said it's possible?

A    It is possible.

Q    Okay. Ah

A    Cause with the car, with the car in that position, from where I was standing I couldn't see the other side of the intersection.

Q    Okay all right great. All right. Ah that's, that's all we're looking for. Is a fair representation.

SGT. WYSE:

Q    All right the time now is approximately 0325. I want to thank you very much Mr. Anderson for your cooperation in this matter.

KK-------------------------------------------------0-------------------------------------------------

/03              Criminal case docketed. (pks)

/2/03            Jurisdictional notice issued.   (No j&c yet) [03-4299] JC
                 follow-up due on 4/16/03. (pks)

4/2/03           Fee notice issued to Appellant Robert David Beckley.
                 [03-4299]  IFP application/fee due on 4/17/03 for Robert
                 David Beckley. (pks)

4/8/03           Judgment and commitment order filed in the District Court
                 on 4/4/03. NOA date revised. [03-4299] © (jsj)

5/21/03          Rule 45 notice issued to Appellant Robert David Beckley for
                 fee default. IFP application/fee due on 6/5/03 for Robert
                 David Beckley.  [03-4299] (pks)

6/27/03          ORDER FILED [3814302] dismissing case pursuant to Local
                 Rule 45. [03-4299] ~ [3814302] (pks)

6/27/03          Mandate issued.  [03-4299] ~ [3814303]  Procedurally
                 Terminated Without Judicial Action; Default. (pks)

7/7/03           Motion filed by Appellant Robert David Beckley to reinstate
                 case [3818370-1].   [03-4299] ~ [3818370] (jsj)

7/7/03           Informal action taken terminating motion to reinstate case
                 informing appellant that in order for the Court to consider
                 a motion to reinstate, he must first rectify the default
                 which is to either pay the $105 docketing fee or file an
                 IFP application with the District Court.[3818370-1]
                 [03-4299] ~ [3818478] (jsj)

7/15/03          Notice of district action filed.   Type of action taken: IFP
                 application filed with District Court per conversation with
                 Kim in the clerk's office USDC. Update will be forwarded
                 once a ruling is made. [03-4299] ~ [3822295] (jsj)

/23/03           District Court notice received of the granting of IFP for
                 Appellant Robert David Beckley. [03-4299] ~ [3826980] (pks)

/24/03           Case reopened. [03-4299] (pks)

/24/03           ORDER FILED [3827503] to reopen case [3827503-1]. [03-4299]
                 ~ [3827503] (pks)

/24/03           ORDER FILED [3827548] appointing Donald Dickerson as CJA
                 counsel for Appellant Robert David Beckley [3827548-1].
                 [03-4299] ~ [3827548] (pks)

/24/03           Docketing notice issued. [03-4299] ~ [3827561] (pks)

/12/03           Motion filed by Appellant Robert David Beckley to
                 substitute attorney. [3837629-1] [03-4299] ~ [3837629] (jsj)